IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

TINA C. DODSON                                                                                    PLAINTIFF

v.                        NO. 4:21-cv-00008 PSH

KILOLO KIJAKAZI, Acting Commissioner                                           DEFENDANT
of the Social Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff Tina Dodson ("Dodson") challenges the denial of her application for supplemental security income payments and does so on two grounds. Dodson first maintains that her residual functional capacity was erroneously assessed because her impairments are more limiting than the Administrative Law Judge ("ALJ") found. Second, Dodson maintains that a hypothetical question, the answer to which the ALJ relied upon, did not fully capture the limitations caused by Dodson's impairments. Because substantial evidence on the record as a whole supports the ALJ's decision, and he committed no legal error, his decision is affirmed.[1]

---

[1]    The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

The record reflects that Dodson was born on April 12, 1974, and was forty-four years old on October 29, 2018, the amended alleged onset date. In her application for supplemental security income payments, she alleged that she is disabled as a result of mental and physical impairments.

The record reflects that prior to the amended alleged onset date, Dodson sought medical attention for impairments that include depression, anxiety, and low back pain.[2] For instance, on January 27, 2016, or more than two years before the amended alleged onset date, Dodson was seen by Dr. Clifford Lamar Evans, M.D., ("Evans") for a general physical examination. See Transcript at 597-601. A physical examination was unremarkable, but Dodson reported, inter alia, that she was unable to be around people, had extreme mood swings, and had severe anxiety with panic attacks. She preferred to be alone in a dark house and cried easily. She also had asthma related to anxiety and a depressed mood. Evans noted that Dodson was in need of a mental status evaluation and diagnosed a "social anxiety disorder" and a "bipolar personality disorder with chronic depression." See Transcript at 601.

---

[2]   In Dodson's brief, she cites the Court to medical evidence as far back as September 14, 2000, or more than eighteen years before the amended alleged onset date. See Docket Entry 14 at CM/ECF 5. Although the Court will note evidence prior to the amended alleged onset date in order to place her medical condition in an historical context, the Court will not look back eighteen years.

On January 28, 2016, Dodson was seen by Dr. Patricia Walz, Ph.D., ("Walz") for a mental diagnostic evaluation. See Transcript at 602-606. Dodson reported, inter alia, a history of abuse, a sixth grade education, and having struggled with depression. She was independent with activities of daily living but sometimes had to be reminded to bathe. Dodson's presentation was "dramatic and she acted childlike," which Walz believed to be "a bit manipulative and exaggerated." See Transcript at 605. Walz diagnosed a panic disorder and borderline personality disorder.

Beginning on January 29, 2018, and continuing through December 3, 2019, Dodson was seen on multiple occasions for mental impairments that were characterized at times as depression, anxiety, a bipolar disorder, a schizoaffective disorder, agoraphobia, and post-traumatic stress disorder.[3] Dodson reported, inter alia, panic attacks, insomnia, and anger. She had persistent sadness, frequent crying spells, and problems with relationships. Notwithstanding her complaints, she oftentimes exhibited a normal mood and affect; normal insight, judgment, and cognitive functioning; and a clear, coherent, goal-directed thought content.[4]

---

[3]   See e.g., Transcript at 612-615; 688-704; 622-626; 627-634; 635-641; 642-648; 848-852; 880-882; 912-917; 909-911; 906-908; 904-905; 900-903; 890-891; 897-899; 894-896.

[4]   See e.g., Transcript at 614, 617, 881, 887, 895, 898, 902, 907, 910, 914-915.

On February 27, 2019, Dodson was seen by Walz for a second mental diagnostic evaluation. See Transcript at 848-852. Dodson's mental allegations were recorded to be, in part, as follows:

> ... Hygiene was impaired in that her hair looked dirty, she had a metallic-type body odor and her hands and fingernails were dirty. ... She was wringing her hands and crying in the waiting room. She had a weathered appearance and looked older than her stated age.
>
> She has applied for disability benefits because, "of my mental status." When asked how this affects her ability to work, she said, "I just have outrages." She has had temper problems all her life. She has a bad back as well.
>
> She described her recent mood as "bad." She has had suicidal ideation as recently as yesterday. She hasn't made a suicide plan and she cited her boyfriend as reason not to act. She will tell him when she feels that way and he will calm her down. She has made two suicide attempts, the last of which was when she was in her 20's ...

See Transcript at 848. Dodson denied substance abuse and was not drinking alcohol but admitted smoking marijuana every day to help her anxiety. Dodson seemed "a bit sedated or inebriated" during the examination. See Transcript at 850. Walz diagnosed a schizoaffective disorder by history, a mild intellectual development disorder, and cannabis use disorder. With respect to the effects of the impairments on Dodson's adaptive functioning, Walz opined the following:

> How do mental impairments interfere with this person's day to day adaptive functioning? She had a driver's license but lost it years ago because she pointed out. She got it when she was 16 years old. It took her 4 times to pass the written test, and when she did pass it, they read it to her. The last time she drove was about in her late 20's. To pass the time, she plays with her dogs or colors. She has no friends. She met her boyfriend because he was her landlord. She leaves the house only for appointments about once a month.
>
> Capacity to communicate and interact in a socially adequate manner? Social skills would be impaired by anxiety and immaturity. She acted more [like] a teenager than an adult.
>
> Capacity to communicate in an intelligible and effective manner? Speech was clear and intelligible but vocabulary was limited.
>
> Capacity to cope with the typical mental/cognitive demands of basis work-like tasks? Intellectual functioning was estimated to be in the 65 to 75 range.
>
> Ability to attend and sustain concentration on basic tasks? Attention and concentration are impaired.
>
> Capacity to sustain persistence in completing tasks. She would be easily distracted and she has little frustration tolerance.
>
> Capacity to complete work-like tasks within an acceptable timeframe? Speed of information processing was quite slow.

See Transcript at 851. Notwithstanding Walz's observation that Dodson seemed "a bit sedated or inebriated," see Transcript at 850, Walz found no evidence that Dodson was exaggerating or malingering.

On November 21, 2019, Mr. Mark Thomas, LCSW, ("Thomas") completed a medical source statement in which he addressed the impact of Dodson's mental impairments on her work-related abilities. See Transcript at 890-891. Thomas opined that Dodson would have an impaired performance for fifteen percent or more of an eight-hour workday in areas such as understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Thomas also opined that on average, Dodson would likely be absent from work four days a month because of her impairments and medical treatment. In so opining, Thomas noted that Dodson suffers from post-traumatic stress disorder, a major depressive disorder, and a panic disorder.

During the period between January 29, 2018, and December 3, 2019, Dodson was occasionally seen for complaints that included low back pain. For instance, Dodson was seen by Dr. Misty Gonzalez, M.D., ("Gonzalez") on January 29, 2018. See Transcript at 612-615. The progress note reflects that Dodson had tenderness and pain in the lumbar portion of her spine but had a normal range of motion and no bony tenderness. Gonzalez diagnosed, in part, "chronic midline low back pain, with sciatica presence unspecified." See Transcript at 615. She prescribed meloxicam for pain and ordered a lumbar spine x-ray.

On February 12, 2018, Dodson was seen for persistent low back pain that radiated into her legs. See Transcript at 733-736  The pain was accompanied by intermittent numbness and tingling in her calves and was exacerbated by movement. She had 4/5 strength in her lower extremities. An x-ray revealed "spondylolysis at L5 of uncertain age with no spondylolisthesis." See Transcript at 733. A period of physical therapy was recommended, as were range of motion and strengthening exercises.

On April 30, 2018, Dodson was seen by Gonzalez for complaints that included back pain. See Transcript at 616-618. Dodson continued to have tenderness and pain in the lumbar portion of her spine but a normal range of motion and no bony tenderness. Dodson was continued on medication and referred for interventional pain management.

On June 6, 2018, Dodson was seen by Dr. Natalie Strickland, M.D., ("Strickland") for complaints of back pain. See Transcript at 727-730. Dodson described the pain as a throbbing, aching pain that was exacerbated by bending, standing, and sitting. She rated the pain as ten on a ten point pain scale. A physical examination was largely unremarkable. Strickland diagnosed lumbar spondylolysis, chronic lumbar back pain, and myofascial pain. Strickland continued Dodson on medication and recommended a medial branch block of Dodson's lumbar facet joints.

Dodson's medical records were reviewed by state agency medical consultants Drs. Brad Williams, Ph.D., ("Williams"); Rosey Seguin-Calderson, M.D., ("Seguin-Calderon"); and Elizabeth Bucolo, Psy.D. ("Bucolo"). See Transcript at 72-74, 95-96, 100. The consultants opined that Dodson is capable of performing medium work with postural limitations and where interpersonal contact is incidental to the work performed.

The record contains a summary of Dodson's work history. See Transcript at 216-232. In short, the history is poor.

Dodson completed a function report in connection with her application for supplemental security income payments. See Transcript at 249-256. In the report, she represented that she has trouble attending to her personal care, cannot prepare her own meals, cannot perform any house or yard work, and rarely goes out of her house. She can, though, shop in stores. She has no hobbies, save feeding her dogs, and does not spend time with others.

Dodson testified during the administrative hearing. See Transcript at 35-54. She last worked in 2013 when she worked as a waitress. She stopped working because of her back problems. For her pain, she has received physical therapy, a medial branch block, and some medication. Dodson

takes medication for her depression and anxiety, which sometimes helps her symptoms. She spends most of her day in her bedroom, preferring to be alone. She has trouble with concentration and focus. She can become outraged with people and has been fired from jobs for her outbursts. She has experienced several traumatic events, which cause her to have severe flashbacks and nightmares.

The ALJ found at step two of the sequential evaluation process that Dodson has severe impairments in the form of "lumbar degenerative disc disease, osteoarthritis, asthma versus chronic obstructive pulmonary disease with heavy tobacco use, anxiety disorder, affective disorder, post-traumatic stress disorder, and personality disorder." See Transcript at 14. The ALJ assessed Dodson's residual functional capacity and found that Dodson is capable of light work with the following limitations:

> The claimant can occasionally climb ramps and stairs; balance, stoop, kneel, crouch and crawl but can never climb ladders, ropes or scaffolds. The claimant can occasionally be exposed to pulmonary irritants and vibration. The claimant can never be exposed to unprotected heights. The claimant can understand and remember simple instructions. The claimant can sustain attention and concentration to complete simple tasks with regular breaks every two hours. The claimant can interact as needed with supervisors and coworkers and occasionally interact with the pubic. The claimant can adapt to routine work conditions and occasional work place changes that are gradual[ly] introduced.

See Transcript at 16-17. As a part of so finding, the ALJ found unpersuasive the opinions offered by Walz and did so for three reasons. First, Dodson appeared sedated or inebriated at the February 27, 2019 evaluation, "which does not support an accurate representation of [Dodson's] abilities ..." See Transcript at 21. Second, Walz failed to "indicate the functional limitations of what [Dodson] could do." See Transcript at 21. Last, the record is "consistent with [Dodson] having moderate limitations but she is able to perform work activities with the above listed residual functional capacity." See Transcript at 21. The ALJ also found unpersuasive the opinions offered by Thomas and did so for three reasons. First, Thomas' opinion are not supported by "any function by function analysis." See Transcript at 22. Second, "... Thomas' first interaction with [Dodson] began in September 2019 and he only saw [Dodson] three times prior to his opinion." See Transcript at 22. Last, Thomas' opinions are "not consistent with the longitudinal record." See Transcript at 22. The ALJ found at step four that Dodson is unable to perform her past relevant work as a waitress. At step five, the ALJ relied upon the testimony of a vocational expert and found that there is other work Dodson can perform. On the basis of those

findings, the ALJ concluded that Dodson is not disabled for purposes of the Social Security Act.

Dodson first maintains that her residual functional capacity was erroneously assessed because her impairments are more limiting than the ALJ found. Dodson so maintains for four reasons. First, "[t]he most egregious flaw in the [residual functional capacity] is the ALJ's inaccurate description of [Dodson's] mental limitations. See Docket Entry 14 at CM/ECF 13. Second, the assessment of Dodson's "physical limitations is also improper." See Docket Entry 14 at CM/ECF 16. Third, the ALJ did not properly evaluate the medical opinion evidence. Last, "the ALJ's analysis of [Dodson's] subjective complaints does not comply with the legal standards." See Docket Entry 14 at CM/ECF 17.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The ALJ does so by considering all the evidence in the record. See Grindley v. Kijakazi, 9 F.4th 622 (8th Cir. 2021).

As a part of making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). The regulations governing the case at bar no longer apply

the long-standing "treating physician" rule but instead require consideration of the following:

> ... Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to "explain" their decisions as to the two most important factors— supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).

See Phillips v. Saul, No. 1:19-cv-00034-BD, 2020 WL 3451519, 2 (E.D.Ark. 2020).

With respect to the claimant's subjective complaints, the ALJ is obligated to consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluate the intensity, persistence, and limiting effects of the pain or other symptoms. In evaluating the intensity, persistence, and limiting effects of the claimant's pain or other symptoms,

the ALJ must consider all the evidence in the record, including evidence of the following factors:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms …; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

See Social Security Ruling 16-3p. See also 20 C.F.R 404.1529; Polaski v. Heckler, 751 F.3d 943 (8th Cir. 1984).

Having reviewed the record, the Court finds that the ALJ did not err in assessing Dodson's residual functional capacity. The ALJ adequately evaluated all of the evidence relevant to Dodson's mental impairments, which, by just about any measure, are her most severe impairments. The ALJ accounted for the limitations caused by the impairments and could and did find that the limitations, while meaningful, are not disabling. The ALJ also evaluated all of the evidence relevant to Dodson's physical impairment, specifically, her back pain. The ALJ accounted for Dodson's back pain in crafting the assessment of her residual functional capacity and

could and did find that her pain is not disabling. The Court so finds for the following reasons.

The evidence relevant to the limitations caused by Dodson's mental impairments is inconsistent and is capable of more than one acceptable characterization. It is true that Dodson consistently reported, inter alia, panic attacks, insomnia, and anger. She also reported persistent sadness, frequent crying spells, and problems with relationships. Notwithstanding her complaints, she oftentimes had a normal mood and affect; normal insight, judgment, and cognitive functioning; and a clear, coherent, goal-directed thought content.

When Dodson was seen by Walz at the January 28, 2016, evaluation, Dodson's presentation was "dramatic and she acted childlike," which Walz believed to be "a bit manipulative and exaggerated." See Transcript at 605. When Walz saw Dodson for the second evaluation on February 27, 2019, Walz found no evidence that Dodson was exaggerating or malingering but did observe that Dodson seemed "a bit sedated or inebriated." See Transcript at 850.

Dodson testified during the administrative hearing that she had been fired from jobs because of her explosive anger, or what she described as "outrage at people." See Transcript at 48. She also testified, though, that

she had stopped working in 2013—her most recent job—because of her "back problems," see Transcript at 36, not her mental impairments.

Dodson has taken some medication and attended therapy and counseling. The medication and frequency of the therapy and counseling is unremarkable, and there is evidence she failed to take the medication as prescribed and follow a treatment plan. See e.g., Transcript at 880, 886.

Dodson faults the ALJ for discounting Walz and Thomas' opinions. The ALJ, though, could find their opinions unpersuasive. With respect to Walz's opinions, they are not supported by progress notes as she did not regularly see Dodson. Instead, Walz saw Dodson for the evaluations. With specific regard to Walz's second evaluation of Dodson, the ALJ could find that Walz's opinions are of limited value because Dodson appeared a bit sedated or inebriated. It is also possible to construe Walz's opinions as being inconsistent with other evidence in the record. Although Walz opined that Dodson has meaningful limitations, Dodson oftentimes had a normal mood and affect; normal insight, judgment, and cognitive functioning; and a clear, coherent, goal-directed thought content.

With respect to Thomas' opinions, one of the reasons the ALJ gave for finding them unpersuasive—Thomas only saw Dodson three times prior to offering his opinions—is suspect. One of the other reasons the ALJ gave,

though, i.e., the opinions are inconsistent with the record, is a good reason for finding them unpersuasive. The Court so finds for two reasons.

First, Thomas' opinions are not supported by his own progress notes. Although Thomas opined that Dodson has significant limitations, and typically had a depressed and anxious mood, his notes reflect that she had no other deficits. See Transcript at 910, 907, 898, 895. He routinely noted that her appearance was appropriate, her behavior was cooperative, her stream of thought was clear and coherent, she had no abnormalities of thought content, and she had no perceptual disturbances. Additionally, she routinely had an appropriate affect, present insight, and good judgment.

Second, it is possible to construe Thomas' opinions as being inconsistent with the other evidence in the record. For instance, Gonzalez observed more than once that Dodson had a normal mood and affect and normal behavior. See Transcript at 614, 617. Strickland made somewhat similar findings, noting that Dodson had an euthymic affect, a goal directed thought process, good eye contact, and "communicates clearly and answers questions appropriately." See Transcript at 729.

With respect to Dodson's back pain, the evidence relevant to the limitations caused by her pain is minimal. The record reflects that she did not regularly seek medical attention for her pain, particularly after the

amended alleged onset date. Instead, her presentations for her pain were sporadic and infrequent.

As to the evidence that is in the record, the evidence is largely unremarkable. At a February 12, 2018, presentation, Dodson had 4/5 strength in her lower extremities, and an x-ray simply revealed "spondylolysis at L5 of uncertain age with no spondylolisthesis." See Transcript at 733. A period of physical therapy was recommended, as were range of motion and strengthening exercises.

When Dodson saw Strickland on June 6, 2018, Dodson rated her pain as ten on a ten point pain scale. A physical examination, though, was largely unremarkable. Save some medication, the only treatment Strickland recommended was a medial branch block. It is also worth noting that Strickland observed that "I do not think any activity restrictions are indicated at this time." See Transcript at 730.

Dodson additionally faults the ALJ for failing to give adequate consideration to Dodson's subjective complaints. Although admittedly the ALJ provided minimal detailed analysis of Dodson's subjective complaints,

he nevertheless adequately considered her complaints throughout his opinion.[5]

Dodson reported an extreme limitation in her daily activities, testifying that she spends most of her day in her bedroom. There is little evidence, though, to support such an extreme limitation in her daily activities. She takes little medication for her symptoms and has received minimal treatment for them. Her work history is poor, and she last worked in 2013, or more five years before the amended alleged onset date. In sum, the ALJ could evaluate Dodson's subjective complaints as he did.

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and is based on substantial evidence. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D. 2016). In fact, the Court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. See Id. Here, the evidence is capable of more than one

---

[5] The ALJ noted his obligation to consider Dodson's subjective complaints pursuant to Social Security Ruling 16-3p and Polaski v. Heckler. He found that although her medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence in the record.

acceptable characterization, and the ALJ could find as he did with respect to Dodson's residual functional capacity.[6]

In conclusion, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings, and he did not commit legal error. Dodson's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 12th day of April, 2022.

_____
UNITED STATES MAGISTRATE JUDGE

---

[6] Dodson additionally maintains that a hypothetical question, the answer to which the ALJ relied upon, did not fully capture the limitations caused by Dodson's impairments. It is axiomatic that testimony from a vocational expert is substantial evidence on the record as a whole only when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). Dodson's challenge has no merit. The question posed, and relied upon, by the ALJ adequately captured the concrete consequences of Dodson's deficiencies. See Transcript at 55-56.